# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Ricky Robinson (K-82958), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 25 C 2492 |
| v. | ) | |
| | ) | Hon. Virginia M. Kendall |
| Ms. Griffin, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

The Court has reviewed Plaintiff's Amended Complaint [15] under 28 U.S.C. § 1915A, and it may proceed as set forth below. The Court directs the Clerk of Court to send Plaintiff filing instructions and a copy of this order. If Plaintiff fails to keep the Court informed of his address, this action will be subject to dismissal without further warning. A separate order will be issued to initiate service of process on Defendants.

## STATEMENT

Ricky Robinson, a prisoner at Pontiac Correctional Center, brings this *pro se* civil rights action, 42 U.S.C. § 1983, alleging that officials at Stateville Correctional Center labeled him a snitch and placed him at risk of harm. By order of June 30, 2025, the Court dismissed Plaintiff's Complaint for failure to state a claim. Now before the Court is Plaintiff's Amended Complaint for initial review.

Because Plaintiff is seeking redress from employees or officials of a governmental entity, the Court must screen his pleading and dismiss the pleading, or any portion of the pleading, if it is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief from an immune defendant. *See* 28 U.S.C. § 1915A; *Jones v. Bock,* 549 U.S. 199, 213–14 (2007); *Shaw v. Kemper*, 52 F.4th 331, 333 (7th Cir. 2022). At screening, the Court uses the standard applied to motions to dismiss and will allow a claim to proceed "only to the extent that the prisoner has pleaded facts to demonstrate that he has a plausible claim for relief." *Schillinger v. Kiley*, 954 F.3d 990, 993–94 (7th Cir. 2020). When screening a *pro se* plaintiff's complaint, courts construe the plaintiff's allegations liberally. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (per curiam). Courts also must "accept all well-pleaded facts as true and draw reasonable inferences in the plaintiff['s] favor." *Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016).

Plaintiff alleges the following. On the morning of March 10, 2023, Plaintiff was escorted to the Internal Affairs Office, where he was served what appeared to be legal mail and immediately handcuffed. (*See* Pl.'s Am. Compl., Dkt. No. 15, at pgs. 8-9.) Plaintiff was interviewed by Sgt. Milsap and a Hispanic male officer on suspicion of introducing drugs into the facility via the mail. (*Id.* at pg. 9.) Plaintiff was placed on investigative status and sent to restrictive housing, Cell B-

608. (*Id.*)

On or about March 14, 2023, Plaintiff was called back to the Internal Affairs Office for a second interview with an investigator from Illinois Department of Corrections (IDOC) headquarters in Springfield. (*Id.*) Plaintiff was told that he could be held in restricted housing under investigative status for up to 30 days, and that depending on the lab results on the legal mail contents, he would either be charged or released. (*Id.*) Plaintiff was returned to his cell in the B House. (*Id.*)

During this time in B House, only galleries 2, 4, and 6 were in use. (*Id.* at pgs. 9-10.) Galleries 2 and 4 housed general population inmates. (*Id.* at pg. 10.) Gallery 6 was used by the X-House sergeant and staff to house restrictive housing inmates, approved and unapproved protective custody inmates, and X-House workers. (*Id.*)

Plaintiff states that because Galleries 8 and 10 were empty, and because inmates were in cells with bars rather than behind doors, it was easy to hear conversations between galleries. (*Id.*) Additionally, inmates acquired pieces of broken mirrors, although mirrors were not allowed in restrictive housing. (*Id.*) Plaintiff managed to acquire a piece of broken mirror. (*Id.* at pg. 11.)

On two occasions between March 14, 2023, and March 17, 2023, Defendant Correctional Officer Griffin "made an appearance" on Gallery 6 to serve disciplinary or investigative reports. (*Id.*) On one of those occasions, Officer Griffin served Plaintiff with an investigative report. (*Id.*) On both occasions, Plaintiff watched through his mirror and listened as she spent "10 minutes or more" telling inmates that before she could print and serve Plaintiff with a disciplinary report, "it went away." (*Id.*) Officer Griffin allegedly said that Plaintiff was a "known snitch" who was "responsible for all the raids going on." (*Id.*) She indicated that Plaintiff would be sent back to his cell after the investigation was over and allowed to resume his schooling as if nothing had happened. (*Id.* at pgs. 11-12.) She allegedly remarked, "he gotta go!" (*Id.* at pg. 12.)

Plaintiff states that at the time this occurred, he had been incarcerated at Stateville for 23 years and was "very much aware of the dangers of being labeled a snitch in prison." (*Id.*) He began to "listen intently" to what was being said outside his cell. (*Id.*) He heard a "known gang member" that was housed in a nearby cell tell Officer Griffin that if Plaintiff went to the yard, he would attack him. (*Id.* at pgs. 12-13.)

On or about March 17, 2023, during the 11 p.m. to 3 p.m. shift, Plaintiff "easily heard" officers conversing amongst each other, and "regurgitat[ing]" the same snitch allegations" about Plaintiff. (*Id.* at pg. 13.) Between March 17, 2023, and March 30, 2023, Plaintiff began to receive "direct threats of violence" from inmates on Galleries 4 and 6. (*Id.*) An inmate named D. Thomas on Gallery 4 loudly taunted Plaintiff that he believed that Plaintiff had snitched on him and gotten him fired from the law library. (*Id.*) This inmate threatened to put Plaintiff in the hospital if he caught up with him. (*Id.*)

Plaintiff stopped going to in-house medical appointments and cancelled his in-person and video visits to avoid others. (*Id.* at pgs. 13-14.) He began to keep a daily journal. (*Id.* at pg. 14.) He was on constant alert "with the fear of attack," stopped sleeping, and became "even more

paranoid." (*Id.*)

On or about March 25, 2023, Plaintiff confirmed from the "ADA yard line" (it is unclear what this is), that "the rhetoric had spread all over the institution that Plaintiff is a snitch." (*Id.*) Inmate D. Thomas and others on Gallery 4 yelled up to Plaintiff, called him a snitch, and told him he would not be safe in general population. (*Id.*) Plaintiff believed them, and "grew more and more mentally unstable" as he realized that he would not be safe at the prison. (*Id.* at pgs. 14-15.) Plaintiff alleges that he knew he would have to check into protective custody and transfer prisons, and with that, drop out of his master's degree college program. (*Id.* at pg. 15.)

Between March 28 and March 30, 2023, Plaintiff, not wanting to wait until he was physically attacked, requested protective custody via Correctional Officer Plase. (*Id.*) Officer Plase brought Plaintiff a slip to fill out requesting protective custody, and Plaintiff returned it to him. (*Id.*) Officer Plase said that he was taking it to Sgt. Gonzalez. (*Id.*) Shortly thereafter, Plaintiff heard Sgt. Wilson-Pugh "exclaim with excitement" that she knew Plaintiff was a snitch and now they had proof. (*Id.* at pgs. 15-16.)

After a short while, Plaintiff heard an inmate named Antonio Kendrick on Gallery 4 say that he would no longer provide barber services to Plaintiff. (*Id.* at pg. 16.) Plaintiff then heard one of Kendrick's neighboring inmates say, "let me see it," and "you should make copies." (*Id.*) He then heard Sgt. Gonzalez say, "[D]on't worry I'll get yall [sic] enough for every cell house." (*Id.*) Although his allegations are not entirely clear, Plaintiff apparently contends that Sgt. Gonzalez showed his request for protective custody to these inmates. (*Id.*; *see* Pl.'s Compl., Dkt. No. 13, at pg. 15.)

Plaintiff's investigative status was lifted and he was relocated to an "unapproved P.C. cell," B-621. (*Id.*) Plaintiff did not feel safe being out of camera range and close to the back stairs, which "heightened his fears of being attacked." (*Id.*)

At some point, Plaintiff went on crisis watch after officers told him he was being transferred to a general population cell. (*Id.* at pgs. 16-17.) Plaintiff acknowledges that he was paranoid and had no intention of going to a general population cell. (*Id.* at pg. 17.) Plaintiff was transferred to a bullpen, and believed officers were going to physically harm him during this transfer, although they did not. (*Id.*)

Shortly thereafter, a mental health worker responded and Plaintiff told this worker that his life was in danger. (*Id.*) Plaintiff agreed to go on crisis watch in the infirmary. (*Id.*)

When Plaintiff got to the infirmary, he was afraid, as he did not see any cameras in the area where he was housed. (*Id.* at pg. 18.) Plaintiff was stripped of his clothing and given a smock. (*Id.*) The cell was cold and the light stayed on all the time because Plaintiff was on crisis watch. (*Id.*) Plaintiff alleges that he "experienced bouts of psychosis" and "hallucinations" while on crisis watch. (*Id.*)

While he was on crisis watch, Plaintiff's request for protective custody was approved. (*Id.*) Plaintiff subsequently was released from crisis watch and moved to a non-watch cell in the

3

infirmary. (*Id.*) On at least two occasions during this time, Plaintiff alleges that he was "recklessly exposed to danger" because he was left to sit in waiting areas with several general population inmates. (*Id.*) Plaintiff alleges that this left him in fear of whether an attack would happen, although it apparently did not. (*Id.*)

After he was released from crisis watch, Plaintiff called someone named Lewis Henry (whose relationship to Plaintiff is not explained). (*Id.*) Henry told Plaintiff that he had received calls from Antonio Kendrick and other inmates at Stateville, as well as from inmates at other prisons, indicating that "Plaintiff snitched, went crazy and checked into P.C." (*Id.*) Apparently, these inmates had Henry look up Plaintiff's criminal case to show that he had made a confession in that case. (*Id.*) Plaintiff alleges that IDOC inmates have the ability to look up the details of criminal and civil cases on their tablets. (*Id.* at pgs. 19-20.)

Plaintiff transferred to Pontiac Correctional Center, and states that he struggles with paranoia that is managed only with psychotropic medication. (*Id.* at pg. 20.) Plaintiff kept a calendar of daily events during the relevant time period which was seized in a shakedown at Pontiac. (*Id.*) He alleges that Defendants deliberately created a substantial risk of harm to him by labeling him a snitch, resulting in psychological harm. (*Id.* at pg. 9.)

The Eighth Amendment requires prison officials to protect prisoners from violence at the hands of other prisoners. *Brown v. Budz*, 398 F.3d 904, 909 (7th Cir. 2005). To state such a claim, an inmate must allege facts raising an inference that the defendants were deliberately indifferent to an excessive risk to inmate health or safety. *Sinn v. Lemmon*, 911 F.3d 412, 419 (7th Cir. 2018). Such a claim has two components: (1) the harm to which the prisoner was exposed must be objectively serious; and (2) the prison official must have actual knowledge of the risk. *Id.*

Generally, an Eighth Amendment claim for failure to protect requires the plaintiff to have suffered a physical injury. *See Babcock v. White*, 102 F.3d 267, 272 (7th Cir. 1996) ("[I]t is the reasonably preventable assault itself, rather than any fear of assault, that gives rise to a compensable claim under the Eighth Amendment."). The Seventh Circuit has not foreclosed Eighth Amendment claims based on psychological injury alone, however, provided that the plaintiff plausibly alleges "extreme and officially sanctioned psychological harm." *Doe v. Welborn*, 110 F.3d 520, 524 (7th Cir. 1997); *see Kyles v. Beaugard*, No. 15-CV-8895, 2023 WL 5277882, at *16 (N.D. Ill. Aug. 16, 2023) (collecting cases).

The requirement of extreme and officially sanctioned psychological harm "presents a high bar." *Kyles*, 2023 WL 5277882, at *17. It could be met, however, if prison officials intentionally create a fear of assault by telling other inmates that the prisoner plaintiff is an informant. *Gibson v. Donaldson*, No. 1:15-cv-01465, 2018 WL 731957, at *9 (S.D. Ind. Feb. 6, 2018). The Court will therefore allow Plaintiff to proceed at this early stage of the case on his Eighth Amendment failure-to-protect claims against Officer Griffin and Sgt. Gonzalez in their individual capacities only. *See de Lima Silva v. Dept. of Corrections*, 917 F.3d 546, 565 (7th Cir. 2019) (no official capacity claims for damages against the IDOC or any of its employees).

In allowing this case to proceed, the Court observes that Plaintiff has dropped many of the more far-fetched allegations in his original pleading that pointed in the direction of his claims

being the result of a paranoid fantasy. But Plaintiff is warned that he bears the burden of proof for his allegations, and that even as a *pro se* litigant, he is subject to Federal Rule of Civil Procedure 11. *See* Fed. R. Civ. P. 11(a). Rule 11 provides that by signing a pleading, a party represents to the court, among other things, that his factual contentions have evidentiary support or likely will have evidentiary support after further investigation. *See* Fed. R. Civ. P. 11(b).

The Court instructs Plaintiff to file all future papers concerning this action with the Clerk of this Court in care of the Prisoner Correspondent. Every document submitted by Plaintiff must include a certificate of service indicating the date on which Plaintiff gave the document to correctional authorities for mailing. Any letters or other documents sent directly to a judge or that otherwise fail to comply with these instructions may be disregarded by the Court or returned to Plaintiff. Plaintiff is advised that he must promptly submit a change-of-address notification if he is transferred to another facility or released. Failure to do so may lead to dismissal of this action without further warning.

Date:   September 2, 2025                                              /s/  Virginia M. Kendall
                                                                       Chief U.S. District Court Judge